**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BLUE CROSS & BLUE SHIELD OF RHODE ISLAND<br>500 Exchange Street<br>Providence, RI 02903<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>Hubert H. Humphrey Building<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br><br>CENTERS FOR MEDICARE & MEDICAID SERVICES<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>Defendants. | Civil Action No. 1:26-cv-3874 |

**COMPLAINT**

Plaintiff Blue Cross & Blue Shield of Rhode Island ("BCBSRI"), by and through its undersigned counsel, brings this Complaint seeking relief against Defendants the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (together, "Defendants"). In support thereof, BCBSRI alleges as follows:

**INTRODUCTION**

1. Star Ratings are central to the functioning of the Medicare Advantage ("MA") program. They govern the level of funding that a Medicare Advantage Organization ("MAO") receives from the federal government, which directly shapes the benefits, premiums, and quality initiatives that MAOs are able to provide to their enrollees. In establishing the Star Ratings program and acknowledging their significance to MAOs, Congress enacted targeted statutory

protections to ensure that Star Ratings are derived from specified data sources. In addition, the Medicare Act mandates that CMS adopt rules governing payment, among other matters, through notice-and-comment rulemaking. BCBSRI brings this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, to set aside CMS's determination of its 2027 Star Rating on the ground that CMS's reliance on ten measures in calculating that rating contravened these statutory requirements.

2. CMS oversees the MA program, also referred to as Medicare Part C, under which private health insurers deliver Medicare-covered benefits to enrollees under contracts entered into with the federal government. Private insurers that hold such contracts are known as Medicare Advantage Organizations, or MAOs. On an annual basis, CMS uses its Star Ratings program to assess the performance of MA contracts, assigning each a rating on a scale of 1 to 5 stars—a measure designed to convey the quality of coverage to beneficiaries. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii), 423.182(b), 423.186(h)(1)(ii). In deriving each contract's Star Rating, CMS evaluates every MA contract against a standardized group of "measures" applying a uniform methodology that encompasses quality, compliance, and related performance indicators. The ratings that result are designed to fulfill two objectives: (1) communicate coverage quality to beneficiaries, and (2) establish certain payments to MAOs—through rebate retentions and Quality Bonus Payments ("QBPs")—that CMS is required to disburse in the year subsequent to the rating year (*i.e.*, payments trail the ratings by one year).

3. The financial impact of Star Ratings to an MAO is enormous. QBPs and rebate retention dollars directly fund an MAO's ability to protect member benefits and provider networks, lower premiums, and invest in quality improvement, ultimately shaping the competitiveness and value of the MA products available to beneficiaries. Beyond the financial impact, depressed ratings

also inflict significant reputational damage and diminished membership. Specifically, CMS makes overall and individual measure Star Ratings publicly available through its Medicare Plan Finder tool, which shapes beneficiary enrollment decisions and other consumer choices.

4. On October 8, 2026, CMS released the 2027 Star Ratings for MAOs. BCBSRI's Star Rating for contract H4152 included ten measures that were not promulgated via notice-and-comment rulemaking. Five of these measures were also based on data sources not authorized by statute.

5. BCBSRI's claims in this action do not require this Court to plow new ground. In *Clover Insurance Co. v. U.S. Dep't of Health & Human Servs.*, No. 2:25-cv-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026), the U.S. District Court for the Southern District of Georgia addressed and credited the very same legal theories advanced here. There, the court concluded that CMS's reliance on 20 measures in computing the plaintiff's 2026 Star Ratings was unlawful on two independent grounds: (1) ten of those measures exceeded CMS's statutory authority under 42 U.S.C. § 1395w-23(o)(4)(A) because they drew upon data sources not sanctioned by 42 U.S.C. § 1395w-22(e), and (2) the other ten were implemented without the public notice-and-comment rulemaking mandated by 42 U.S.C. § 1395hh(a)(2). The court accordingly invalidated the plaintiff's 2026 Star Rating and directed CMS to recalculate it in accordance with the court's ruling. CMS complied with that judgment with respect to Clover. But CMS also went one step further—namely, although the *Clover* judgment applied solely to Clover's *2026* Star Rating, CMS of its own accord computed Clover's 2027 Star Rating by omitting the measures that the *Clover* court had invalidated—thus, implicitly acknowledging the legal defects the *Clover* court identified.

6. On top of that, for the Star Ratings of other MAOs in 2026, CMS voluntarily (by way of a June 17, 2026 memorandum) excluded 18 measures—some of which overlapped with

the measures at issue in *Clover* but some of which did not—from their calculations. In other words, CMS voluntarily excluded some measures from the 2026 Star Rating calculations despite the fact that those measures were not part of the *Clove*r lawsuit—again, implicitly acknowledging that the measures are invalid. Certain of the measures that BCBSRI challenges in this case align with measures that CMS voluntarily excluded last year.

7. Despite the *Clover* ruling and CMS voluntarily excluding measures in 2026, when it came to 2027 Star Ratings (which are at issue in this lawsuit), CMS reverted to using all unlawful measures to calculate those Star Ratings. In doing so, CMS included measures afflicted by the identical legal deficiencies identified in *Clover*. Specific to BCBSRI, CMS's inclusion of ten unlawful measures created substantial harm to the company's Star Ratings. Absent those ten improper measures, BCBSRI's 2027 Star Rating for contract H4152 would have been 4.5 Stars, representing an approximate $98 million increase in 2028 QBPs and rebate retention funding. Such funds would enable BCBSRI to protect benefits for its members, reduce premiums, and pursue quality improvement initiatives including greater care coordination. Moreover, by incorporating these unlawful measures into BCBSRI's 2027 Star Ratings calculation, CMS portrayed BCBSRI's ratings less favorably in the eyes of MA consumers compared to competing MAOs that benefit from the unlawful measures, thereby undermining BCBSRI's ability to compete in the marketplace.

8. BCBSRI respectfully requests that this Court order CMS to recalculate BCBSRI's 2027 Star Rating without regard to the ten unlawful measures challenged here.

## JURISDICTION, VENUE, AND EXHAUSTION

9. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. § 701 *et seq.*, and raises questions under the Medicare statute, 42 U.S.C. § 1395 *et seq*.

10. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against United States agencies.

11. On October 8, 2026, CMS published BCBSRI's 2027 Star Rating, which constitutes a final agency action.

12. No administrative process exists through which BCBSRI may seek reconsideration of CMS's action.

13. BCBSRI has standing because it offers a plan through contract H4152, and that contract's 2027 Star Rating was calculated using ten measures that exceeded CMS's statutory authority. The impact of those unlawful measures on BCBSRI's Star Rating results in substantial economic harm—approximately $98 million in payments—and places BCBSRI at a competitive disadvantage in the MA marketplace relative to other MAOs, including Clover, which CMS afforded special treatment.

## PARTIES

14. BCBSRI is a Rhode Island corporation with its principal place of business located in Providence, Rhode Island.

15. Through its contract H4152, BCBSRI delivers coverage to Medicare beneficiaries under Parts C and D.

16. Defendant HHS is a department of the Executive Branch of the United States government responsible for overseeing the Medicare program. Its headquarters are located at 200

Independence Ave., S.W., Washington, D.C. 20201. HHS has delegated authority over the administration of the Medicare program to CMS. *See* 66 Fed. Reg. 35437-03 (June 5, 2001).

17. CMS is the component agency within HHS that bears primary responsibility for administering and overseeing the Medicare program. *See id.* Its headquarters are located at 7500 Security Blvd., Baltimore, MD 21244.

## FACTUAL ALLEGATIONS

### I. Medicare Advantage

18. Medicare is a federal health insurance program created to provide coverage for Americans aged 65 and older, along with qualifying individuals with disabilities. *See* 42 U.S.C. § 1395 *et seq.*

19. Medicare is comprised of four parts, each addressing distinct aspects of healthcare for its beneficiaries. Part A covers inpatient hospital stays, skilled nursing facilities, hospice care, and home health care. Part B covers outpatient care, physician visits, preventive services, home health care, and durable medical equipment. *See* 42 U.S.C. §§ 1395c through 1395i-6 (Part A); 42 U.S.C. §§ 1395j through 1395w-6 (Part B). Under Parts A and B—collectively known as "traditional" or "original" Medicare—the federal government acts as the insurer and directly reimburses providers for services provided to enrolled beneficiaries.

20. Alternatively, a beneficiary may choose to enroll in Medicare Part C, known since 2003 as Medicare Advantage, instead of traditional Medicare. Congress created Medicare Part C through the Balanced Budget Act of 1997. *See* 42 U.S.C. § 1395w-21 *et seq.* Under the MA program, CMS enters into contracts with private health insurers to deliver Medicare-covered benefits to enrolled beneficiaries, transferring the financial risk of benefit delivery from the federal

government to privately operated MAOs, which receive a fixed monthly payment for each enrolled member. *See* 42 U.S.C. § 1395w-23.

21. MAOs must provide their members with benefits no less comprehensive than those available under traditional Medicare. MAOs combine coverage from Parts A and B and commonly also offer prescription drug coverage under Part D, which was enacted in 2003 and took effect in 2006 as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003). *See* 42 U.S.C. § 1395 *et seq.*

22. Among other programmatic changes, the MMA created an annual bidding process. *See id.* § 1395w-23(a)(1)(B). Each year, MAOs submit a bid by the first Monday in June estimating the cost of providing core Medicare benefits for the upcoming plan year, inclusive of overhead and profit. *See id.* When the bid is lower than CMS's county-level benchmark, CMS returns a portion of the savings to the MAO as a "rebate"—funds the MAO may allocate toward supplemental benefits, premium reductions, or both. *See id.* § 1395w-23(a)(1)(E).

## II. <u>Star Ratings and Their Impact on MAOs</u>

### A. Medicare Star Rating calculations

23. CMS first published annual performance ratings for stand-alone Medicare Prescription Drug Plans in 2007. The following year, CMS "introduced and displayed the Star Ratings for Medicare Advantage Organizations . . . for both Part C only contracts . . . and Part C and D contracts (MA-PDs). Each year since 2008, [CMS has] released the MA Star Ratings [subsequently adding] [a]n overall rating combining health and drug plan measures" in 2011. 83 Fed. Reg. 16440, 16520 (April 16, 2018).

24. Each contract's overall Star Rating is a composite score on a scale of 1 to 5 stars, including half-star increments, calculated by evaluating the contract's performance on "measures" designated by CMS. Individual measures carry varying weights (as assigned by CMS) and are

aggregated to produce the contract's single summary rating. Because the overall Star Rating represents a weighted average, performance on any individual measure—especially a heavily weighted one—can move a contract above or below a critical threshold, which in turn can affect the MAO's QBPs.

25. Even a decade before the Star Ratings program was launched, MAOs were required to maintain "an ongoing quality assurance program" for the healthcare services provided to their members. Pub. L. No. 105-33, § 4001, 111 Stat. 251, 291 (1997) (codified at 42 U.S.C. § 1395w-22(e)(1)). Congress expressly granted CMS the authority to select the "quality and outcomes measures" that the Secretary "determine[d] to be appropriate" as elements of plans' quality assurance programs. 42 U.S.C. §§ 1395w-22(e)(1), (e)(2)(A)(xii) (1997). That broad discretion produced uncertainty and confusion, as CMS proposed various quality measures and practice standards with little constraint.

26. In 2003, Congress resolved this uncertainty by codifying CMS's quality measures into statute. *See* MMA, Pub. L. No. 108-173, § 109, 117 Stat. 2066 (2003). These amendments limited CMS to requiring quality-measure data that were "the types of data that were collected by the Secretary as of November 1, 2003," allowing departure from those data types only after submission of a report to Congress. 42 U.S.C. § 1395w-22(e)(3)(B).

27. In 2004, CMS acknowledged that it was constrained under § 1395w-22(e) and that it would thereafter rely solely on its pre-existing, pre-2003 measurement systems addressing clinical quality, health outcomes, and beneficiary satisfaction: the Healthcare Effectiveness Data and Information Set ("HEDIS"), Health Outcomes Survey ("HOS"), and Consumer Assessment of Healthcare Providers and Systems ("CAHPS").

28. CMS stated, “we interpret section 1852(e)(3)(B)(i) of the Act to mean that we can continue to require MA coordinated care plans to collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS, as appropriate for the type of plan.” *See* 69 Fed. Reg. 46,866, 46,886 (Aug. 3, 2004).

29. *CAHPS* surveys “probe those aspects of care for which consumers and patients are the best or only source of information, as well as those that consumers and patients have identified as being important.” 42 C.F.R. § 422.162. *HEDIS* is the Healthcare Effectiveness Data and Information Set that includes clinical measures assessing the effectiveness of care, access/availability measures, and service use measures. *HOS* refers to the Medicare Health Outcomes Survey, which is a patient-reported outcomes measurement. *Id.*

30. CMS launched its Star Ratings system in 2007. In 2010, the Patient Protection and Affordable Care Act (“ACA”), Pub. L. No. 111-148, 124 Stat. 119 (2010), established the Quality Bonus Payment program and adopted the Star Ratings system as its implementing mechanism. Congress designated § 1395w-22(e) as the exclusive source of data for quality rating calculations, omitting the clause that had previously given the Secretary discretion to consider other measures. *See* 42 U.S.C. § 1395w-23(o)(4)(A) (“The quality rating for a plan shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title).”)

31. CMS publishes its Star Rating methodology in annual sub-regulatory guidance documents known as “Technical Notes,” which specify the applicable measures and other key data used to assign measure-level scores and overall Star Ratings. Indeed, it is impossible to even calculate MAO Star Ratings without relying upon the measure specifications contained in CMS’s Technical Notes.

32. 42 U.S.C. § 1395hh(a)(2) mandates that any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" under Medicare must not take effect without promulgation by notice and comment. The Supreme Court has held that the Medicare statute imposes a more stringent notice-and-comment requirement than the APA. *See Azar v. Allina Health Servs.,* 587 U.S. 566, 579 (2019) (affirming the lower court's order vacating a Medicare reimbursement policy that was adopted without notice and comment as required by § 1395hh(a)(2)). CMS's regulations also require CMS to propose and finalize new measures and substantive updates to existing measures through rulemaking. *See* 42 C.F.R. §§ 422.164(c)(2), 422.164(d)(2), 423.184(c)(2), 423.184(d).

33. Star measures and measure specifications, as detailed in Technical Notes, govern MAOs' Star Ratings and are the deciding factor for: (1) whether an MAO is eligible for a QBP, thereby increasing the benchmark against which MAOs bid; (2) the amount of monthly payments an MAO will receive; and (3) the percentage of the differential between the bid amount and the benchmark that MAOs may retain in the form of rebates should the bid amount be lower than the benchmark. *See* 42 U.S.C. § 1395w-23(b)(1)(B), (E). They also affect the ability of MAOs to offer providers higher reimbursement rates, increase their network of providers, expand the scope of benefits to members, and reduce member costs. *See* 42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. §§ 422.266, 422.2410. Finally, they determine MAOs' eligibility to participate in the MA program insofar as CMS terminates MAOs that have Part C Star Ratings below three stars for three consecutive years. *See* 42 C.F.R. § 422.510(a)(4)(xi).

34. Though CMS's Technical Notes play a critical role and establish a substantive legal standard for determining payment for services and the scope of benefits in all of these ways, CMS

has developed these Technical Notes, and the measures they describe, outside of notice-and-comment rulemaking, contrary to 42 U.S.C. § 1395hh(a)(2).

**B. Rebate Retentions and the Quality Bonus Payment**

35. Pursuant to 42 U.S.C. § 1395w-23(o), CMS remits a QBP to MAOs whose contracts achieve a Star Rating of 4 or above. The QBP takes the form of an elevated benchmark—the maximum per-member amount CMS will pay—which in turn enables the MAO to provide supplemental benefits, offer additional programs designed to improve health outcomes, and return excess payments to enrollees as rebates, among other things.

36. MAOs whose bids fall below the applicable benchmark receive a "rebate" from CMS, which they may use to protect benefits, reduce cost-sharing, or lower premiums. The proportion of that rebate an MAO retains is directly tied to its Star Rating.

37. Contracts rated below 3.5 stars (including unrated or new plans) retain 50% of the rebate amount, whereas contracts that achieve a rating of at least 3.5 but below 4.5 stars retain 65%. Contracts reaching the highest tier of 4.5 stars or above retain the maximum 70% of the rebate, thereby providing higher-quality contracts with greater financial flexibility.

38. This tiered framework means that a contract's Star Rating carries significant downstream implications not only for its QBPs but also for its ability to fund more generous benefit designs and sustain competitiveness in the marketplace.

39. For an MAO like BCBSRI, the difference between reaching the 4-Star threshold and falling just short can translate into millions of dollars in forgone annual rebates and bonus payments.

### C. The Medicare Advantage Cycle

40. Star Ratings are released in October of each year in advance of an annual bidding and award cycle that determines payments and services for the following year.

41. The 2027 Star Ratings for BCBSRI's H4152 contract (and all other MAO contracts) were made public on October 8, 2026. Those 2027 Star Ratings determine BCBSRI's rebate retentions and QBPs for use in MA contract year 2028. The bids for the 2028 contracts are due to CMS in June 2027.

42. The following sets forth the schedule of key events in the Medicare 2027 Star Ratings cycle:

| **2027 Star Ratings – Key Periods and Events** | |
|---|---|
| Calendar Year 2025 | Measurement period for the performance data that serve as a baseline for 2027 Star Ratings |
| June 1, 2026 | Statutory bid deadline for 2027, factoring in anticipated 2027 rebate retentions and QBPs based on 2026 Star Ratings |
| Aug. 5, 2026 – Aug. 12, 2026 | Plan Preview 1 for 2027 Star Ratings |
| Sept. 8, 2026 – Sept. 15, 2026 | Plan Preview 2 for 2027 Star Ratings |
| Oct. 8, 2026 | 2027 Star Ratings Published |
| Oct. 15, 2026 | Annual Election Period commences |
| Jan. 1, 2027 | Medicare Advantage Open Enrollment commences |
| June 7, 2027 | Statutory bid deadline for 2028, factoring in anticipated 2028 rebate retentions and QBPs based on 2027 Star Ratings |
| 2028 | QBPs stemming from 2027 Star Ratings paid |

### D. The *Clover* Decision and CMS's Response

43. On November 7, 2025, Clover Insurance Company filed suit in the U.S. District Court for the Southern District of Georgia, challenging its *2026* Star Rating on the ground that CMS had unlawfully adopted 20 measures used in calculating that rating.

44. Clover requested removal of the 20 measures on several bases, including that CMS impermissibly relied upon data sources outside of § 1395w-22(e) to calculate its Star Rating in violation of 42 U.S.C. § 1395w-23(o)(4)(A) and failed to promulgate measures through notice-and-comment rulemaking, as required by 42 U.S.C. § 1395hh(a)(2). The court agreed. In an order entered on May 27, 2026, the court held that 20 measures on which CMS relied in calculating the 2026 Star Ratings were unlawful.

45. As to CMS's failure to comply with 42 U.S.C. § 1395w-23(o)(4)(A), the court held that the statute limits CMS's authority to base its quality rating calculations on measures that use data collected under Section 1395w-22(e), or CAHPS, HEDIS, or HOS. The court found that the plain language of the statute, as well as the "legislative history and general principles of agency power," supports this reading of the statute. *Clover,* 2026 WL 1483515, at *14. The court concluded that ten of the 20 measures challenged by Clover failed to comply with 42 U.S.C. § 1395w-23(o)(4)(A).

46. Specifically, the court stated that eight of the ten challenged measures did not rely on HEDIS, HOS, or CAHPS as primary sources of data. These included: D08, D09, D10, and D12, which are all based on Prescription Drug Event (PDE) data; C33 and D01, which are based on Call Center monitoring data; C32, which is based on Independent Review Entity data; and D11, which is based on Part D Plan Reporting data. *Clover,* 2026 WL 1483515, at *8-9.

47. As to D05 and D06, the court held that the primary data source for both measures is CAHPS; however, these measures use data collected under Part D (not Part C) authority at 42

U.S.C. § 1395w-104(d). Therefore, neither measure relies on data collected under 42 U.S.C. § 1395w-22(e). *Clover,* 2026 WL 1483515, at *9.

48. The court concluded that ten remaining measures challenged by Clover were invalid because CMS failed to promulgate them through notice-and-comment rulemaking. In so concluding, the court held that Star Ratings measure specifications qualify as "statements of policy" that establish or change a substantive legal standard for purposes of Section 1395hh(a)(2) insofar as they "define the scope of MAOs' legal rights to rebates" and "govern payment for services." *Clover,* 2026 WL 1483515, at *23.

49. The court vacated Clover's 2026 Star Rating and directed CMS to recalculate it consistent with its holding.

50. The chart below identifies all the measures held to be unlawful by the *Clover* court:

| | |
|---|---|
| **Category 1:** Measures Based on Non-§ 1395w-22(e) Data Sources | • **C32** (Reviewing Appeals Decisions);<br>• **C33** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D01** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D05** (Rating of Drug Plan);<br>• **D06** (Getting Needed Prescription Drugs);<br>• **D08** (Medication Adherence for Diabetes Medications);<br>• **D09** (Medication Adherence for Hypertension (RAS antagonists));<br>• **D10** (Medication Adherence for Cholesterol (Statins));<br>• **D11** (MTM Program Completion Rate for CMR); and<br>• **D12** (Statin Use in Persons with Diabetes). |
| **Category 2:** Measures Established or Materially Changed Without Notice-and-Comment Rulemaking | • **C03** (Annual Flu Vaccine);<br>• **C04** (Improving or Maintaining Physical Health);<br>• **C05** (Improving or Maintaining Mental Health);<br>• **C15** (Reducing the Risk of Falling);<br>• **C16** (Improving Bladder Control);<br>• **C22** (Getting Needed Care);<br>• **C23** (Getting Appointments and Care Quickly);<br>• **C24** (Customer Service);<br>• **C25** (Rating of Health Care Quality); and<br>• **C27** (Care Coordination). |

51. CMS did not immediately appeal the *Clover* decision and seek a stay. Instead, within two weeks of the order, CMS complied with it by recalculating Clover's 2026 Star Rating as ordered by the court.

52. On July 21, 2026, the Clover defendants filed a notice of appeal to the United States Court of Appeals for the Eleventh Circuit. *See Clover Ins. Co. v. DHHS*, No. 2:25-cv-00142 (S.D. Ga.), Notice of Appeal, ECF No. 67 (July 21, 2026). CMS subsequently requested expedited briefing, which the court granted. *See Clover Ins. Co. v. DHHS*, No. 26-12553 (11th Cir.), Mot. to Restart or Set Briefing Schedule and to Expedite Oral Argument, ECF No. 13 (Aug. 19, 2026); *Clover Ins. Co. v. DHHS*, No. 26-12553 (11th Cir.), Order, ECF No. 15-1 (Sept. 2, 2026). Argument has been scheduled for the week of January 18, 2027. *Clover Ins. Co. v. DHHS*, No. 26-12553 (11th Cir.), Revised Notice to Counsel, at 1 (Sept. 21, 2026).

## III. BCBSRI's 2027 Star Ratings

### A. Publication of 2027 Star Ratings in October 2026

53. On October 8, 2026, CMS published MAOs' 2027 Star Ratings. BCBSRI's H4152 contract received a Star Rating of 3.5.

54. Notwithstanding the *Clover* decision and CMS's implementation of the judgment for Clover, CMS—in calculating the 2027 Star Ratings—relied upon measures that were not based on data collected under 42 U.S.C. § 1395w-22(e), including those specifically addressed in *Clover*, and that were adopted without regard to the notice-and-comment rulemaking requirement set forth in 42 U.S.C. § 1395hh(a)(2).

55. The one exception for 2027 was Clover. For Clover's 2027 Star Rating—but no other MAO's 2027 Star Rating—CMS again removed the measures held unlawful in *Clover* despite no legal requirement to do so: the *Clover* lawsuit—and the *Clover* court's order—only

addressed Clover's 2026 Star Rating. The *Clover* order could not possibly have addressed Clover's 2027 Star Rating because CMS only announced the 2027 Star Ratings on October 8, 2026—well after the court's order was published on May 27, 2026.

56. By voluntarily removing measures for Clover's 2027 Star Ratings, CMS has implicitly conceded that it implemented these measures in violation of the law—if not, there would be no reason to exclude them from Clover's 2027 Star Ratings.

57. Nothing has changed in the past year such that the approach to Star Rating measures found unlawful in *Clover* might be considered lawful now, for purposes of calculating any MAO's 2027 Star Ratings. Congress has also not expanded CMS's legal authority over the Star Rating program in the intervening period. Nevertheless, CMS proceeded to calculate all 2027 Star Ratings (except Clover's) as though the *Clover* decision had never been issued.

58. BCBSRI's Star Rating was calculated by using measures that are unlawful for the same reasons advanced in *Clover*.

59. Specifically, the following ten measures that CMS factored into BCBSRI's Star Rating are invalid because they were not promulgated through notice-and-comment rulemaking:

| | **Measure Number for 2027 Star Rating**[1] |
|---|---|
| Measures Established or Materially Changed Without Notice-and-Comment Rulemaking | • **C07** (Special Needs Plan (SNP) Care Management);<br>• **C10** (Osteoporosis Management in Women who had a Fracture);<br>• **C23** (Customer Service) **(C24, 2026)**;<br>• **C24** (Rating of Health Care Quality) **(C25, 2026)**;<br>• **C25** (Rating of Health Plan) **(C26, 2026)**;<br>• **C26** (Care Coordination) **(C27, 2026)**;<br>• **C32** (Call Center – Foreign Language Interpreter and TTY Availability) **(C33, 2026)**;<br>• **D01** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D05** (Rating of Drug Plan);<br>• **D06** (Getting Needed Prescription Drugs). |

60. These measures establish a substantive legal standard insofar as they are the deciding principle for payments in the form of QBPs and rebates that plans receive from CMS, effectively determining the financial rights of MAOs. They are furthermore critical to the MAOs' ability to negotiate higher reimbursement rates for providers, expand provider networks and benefits, and reduce costs for members.

61. Five of the ten measures are also unlawful in that they failed to comply with the requirement at 42 U.S.C. § 1395w-23(o)(4)(A) that data must be "collected under section 1395w-22(e)":

[1] As indicated in the two charts that appear on this page and the following one, CMS redesignated the alphanumeric symbols assigned to the following 2026 Star Rating measures for plans' 2027 Star Ratings: "Call Center – Foreign Language Interpreter and TTY Availability" from "C33" to "C32"; "Care Coordination" from "C27" to "C26"; "Customer Service" from "C24" to "C23"; "Rating of Health Care Quality" from "C25" to "C24"; and "Rating of Health Plan" from "C26" to "C25." The substance and significance of these measures is unchanged.

| | **Measure Number for 2027 Star Ratings Mapped to 2026** |
|---|---|
| Measures Based on Non-§ 1395w-22(e) Data Sources | • **C07** (Special Needs Plan (SNP) Care Management);<br>• **C32** (Call Center – Foreign Language Interpreter and TTY Availability) **(C33, 2026)**;<br>• **D01** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D05** (Rating of Drug Plan);<br>• **D06** (Getting Needed Prescription Drugs). |

62. Due to CMS's improper inclusion of the above ten measures, BCBSRI's H4152 contract received a Star Rating of 3.5. Had CMS not included these measures, BCBSRI projects that its H4152 contract would have received an increase in its 2027 Star Rating of 1 star (from 3.5 to 4.5 stars) and would have been entitled to substantially larger rebates and QBPs.

63. Moreover, CMS's publication of BCBSRI's Star Rating, as distorted by the inclusion of ten unlawful measures, has caused, and continues to cause, substantial reputational harm to BCBSRI. Star Ratings are publicly available on CMS's Medicare Plan Finder tool, where current and prospective Medicare beneficiaries consult them when making enrollment decisions and brokers and agents often emphasize Stars for selecting plans for enrollees. Simultaneously, because Star Ratings are relative, competing MAO ratings may be artificially elevated, further distorting how BCBSRI's plan is perceived and casting it in a less favorable light.

64. The reputational implications of a below-threshold Star Rating extend beyond any single enrollment cycle. Brokers and third-party marketing organizations that guide Medicare beneficiaries toward particular plans may deprioritize or refuse to market plans rated below 4 stars, diminishing BCBSRI's visibility and competitiveness in the marketplace. Employers and plan sponsors offering MA options to retirees may likewise treat Star Ratings as a proxy for plan quality, and a suppressed rating impairs BCBSRI's ability to compete for and maintain those relationships.

## CLAIMS FOR RELIEF

### COUNT I:
### AGENCY ACTION TAKEN WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW
### (5 U.S.C. § 706(2)(D))

65. BCBSRI incorporates by reference the allegations set forth in paragraphs 1 to 64 above as if fully restated herein.

66. Under 5 U.S.C. § 706(2)(D), an agency is prohibited from acting without observance of procedure required by law.

67. Congress has required that CMS conduct notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Azar v. Allina Health Servs.*, 587 U.S. 566, 570 (2019) (quoting 42 U.S.C. § 1395hh(a)(2)).

68. Furthermore, CMS's own regulations require it to adopt new quality measures through notice-and-comment rulemaking. *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act and then subsequently will propose and finalize new measures through rulemaking."); 42 C.F.R. § 423.184(c)(2) (Part D); *see also id.* § 422.164(d) (requiring notice-and-comment rulemaking under Part C for substantive updates to existing measures), § 423.184(d) (same requirement as applied to Part D).

69. CMS failed to undertake the required notice-and-comment rulemaking and codify "by regulation" the following measures applied to BCBSRI in computing its 2027 Star Ratings:

C07, C10, C23, C24, C25, C26, C32, D01, D05, and D06. Each of these measures establishes a substantive legal standard governing payment for services, scope of benefits, and eligibility to furnish or receive services or benefits within the meaning of 42 U.S.C. § 1395hh(a)(2)—yet none were promulgated by regulation.

70. Because CMS derived the 2027 Star Rating for BCBSRI's H4152 contract using measures adopted without observance of procedure required by law (*i.e.*, notice and comment), the Court should set aside BCBSRI's unlawful 2027 Star Rating and direct CMS to recalculate its Star Rating without regard to these measures.

**COUNT II:**
**AGENCY ACTION NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY**
**(5 U.S.C. § 706(2)(A), (C))**

71. BCBSRI incorporates by reference the allegations set forth in paragraphs 1 to 64 above as if fully restated herein.

72. Congress limited the data on which CMS's Star Ratings may be based to data for which an MAO provides for the collection, analysis, or reporting as part of its quality improvement program. 42 U.S.C. § 1395w-23(o)(4)(A) (requiring Star Ratings to be based on "data collected under section 1395w-22(e) of this title").

73. CMS calculated the 2027 Star Ratings for H4152 using five measures challenged in this action that are based on data not collected under § 1395w-22(e): C07, C32, D01, D05, and D06.

74. Because CMS calculated the 2027 Star Ratings for BCBSRI's H4152 contract using data not collected under § 1395w-22(e), the Court should set aside the unlawful 2027 Star Rating and direct CMS to recalculate BCBSRI's Star Rating without regard to these measures.

## **PRAYER FOR RELIEF**

WHEREFORE, BCBSRI respectfully requests that the Court enter judgment in its favor and grant the following relief:

a) Declare that CMS's inclusion of measures C07, C10, C23, C24, C25, C26, C32, D01, D05, and D06 in calculating BCBSRI's 2027 Star Rating was without observance of procedure required by law because CMS failed to adopt those measures through public notice and comment, as required by 42 U.S.C. § 1395hh(a)(2), 42 C.F.R. §§ 422.164, 423.184;

b) Declare that CMS's inclusion of measures C07, C32, D01, D05, and D06 in calculating the 2027 Star Rating for BCBSRI's H4152 contract is unlawful for the additional reason that CMS exceeded its statutory authority because those measures were calculated with data not collected under 42 U.S.C. § 1395w-22(e), as required by 42 U.S.C. § 1395w-23(o)(4)(A);

c) Set aside the overall 2027 Star Rating of the H4152 contract and remand to CMS with instructions to recalculate BCBSRI's 2027 Star Rating after excluding the ten unlawful measures identified in this Complaint;

d) Order CMS to determine BCBSRI's 2028 QBPs and rebate in accordance with the recalculated and correct Star Rating for H4152;

e) Order CMS to permit BCBSRI to revise any previously submitted MA bid(s) necessary to effectuate the judgment, consistent with this Court's order, the recalculated Star Rating, and the revised QBPs and rebate; and

f) Award BCBSRI such other and further relief as the Court may deem just and proper, including costs and fees, as permitted by law.

[*Signature Page Follows*]

Dated: November 3, 2026

/s/ Daniel W. Wolff
Daniel W. Wolff
DWolff@crowell.com
D.C. Bar No. 486733
**Crowell & Moring LLP**
600 Fifth Street, N.W.
Washington, DC 20001
Telephone: (202) 624-2621

Steven D. Hamilton (*pro hac vice* forthcoming)
StevenHamilton@crowell.com
Illinois Bar No. 6289663
**Crowell & Moring LLP**
300 N. LaSalle Drive, Suite 2500
Chicago, IL 60654
Telephone: (312) 379-7615

*Counsel for Plaintiff*